CULPEPPER, Judge.
The defendant appeals a judgment awarding plaintiff $1500 damages for false arrest. We reverse.
The issue is whether the arresting officer had probable cause to arrest plaintiff for committing in the officer’s presence the misdemeanor of interfering with the officer’s investigation of a traffic accident.
On the night in question, there were two automobile accidents at the intersection of Louisiana State Highway 1, a four-lane thoroughfare running north and south, and Powell Lane, a two-lane highway running east and west. After the first accident, which was major and involved serious personal injuries, one of the involved automo *601 biles was blocking one of the north bound lanes of Highway 1. Two state troopers and a deputy sheriff were present investigating that accident when the plaintiff, proceeding west on Powell Lane, approached the intersection. Lt. Stephens was standing in the intersection directing traffic. Nigreville stopped at the intersection in obedience to Stephens’ signal. Then Stephens motioned a vehicle, driven by Miss Cason, to proceed in a northerly direction on Highway 1. Nigreville mistakenly understood the trooper’s motion was for him to proceed into the intersection. Nigreville pulled out into the intersection, colliding with the Cason vehicle.
In his petition, plaintiff sought damages for the cost of repairs to his automobile, on the grounds that the state police caused the accident. However, the trial judge found that plaintiff caused the accident by his failure to obey the trooper’s signal directing him to stop. On appeal, plaintiff does not argue the trial judge erred in finding it was plaintiff’s negligence, not that of the state trooper, which caused the accident.
Regarding plaintiff’s demands for damages for false arrest, he admits that after the accident he was “upset” because he felt the state trooper who was directing traffic caused the accident by giving plaintiff a signal to move forward into the intersection. However, plaintiff contends he cooperated with the officers during their investigation of the accident, that he did not refuse to obey their instructions, did not curse them, did not threaten to strike them, nor did he interfere in any way with their investigation of the accident. It is the plaintiff’s position that Tpr. Mark Harper became angry and arrested plaintiff after plaintiff pointed his finger at Harper and said “You’ll pay for this.” In his brief, plaintiff states it is obvious this “young trooper thinks that a citizen who says ‘you’ll pay for this’ can be arrested solely for that. He has confused his rights as a police officer in a democratic society with those rights of the secret police in Russia or Iran.”
In direct conflict with plaintiff’s testimony as to the events leading up to his arrest, the defendant presented the testimony of Lt. Stephens, Tpr. Harper, Tpr. Wagner, Dy. Sheriff Baden and Miss Cason. All five of these witnesses testified generally to the effect that following the accident in which plaintiff was involved he became very belligerent, cursed the officers, appeared to be intoxicated, threatened to attack the officers, and interfered with their investigation to the extent that they finally had to arrest him in order to complete their investigation.
The evidence shows that after the accident in which plaintiff was involved, Lt. Stephens radioed Tpr. Harper and Tpr. Wagner to come to the scene to investigate the Nigreville accident. There was much confusion at the scene. It was raining and Lt. Stephens, assisted by Tpr. Rushing and Dy. Sheriff Baden were investigating the first accident and directing traffic on the four-lane highway.
When Tpr. Harper arrived, Nigreville was standing near the Cason vehicle, which was in the north bound lane some distance north of the intersection. Tpr. Harper testified that Miss Cason looked as though Nigreville was “intimidating” her. Miss Cason testified she was afraid of Mr. Nigre-ville and thought that he was intoxicated because of the way he was cursing and screaming at the officers.
Tpr. Harper first asked plaintiff to move away from Miss Cason’s automobile, at which time plaintiff turned on him and accused him of causing the accident. Of course, Harper was not present when the accident occurred, and he tried to explain this to plaintiff and to get him to calm down. Nigreville did calm down for awhile, and then Lt. Stephens walked up and plaintiff pointed at him and angrily accused Stephens of causing the accident. Harper and Stephens managed to calm Nigreville down after this outburst, but then he cursed Stephens in a belligerent manner, saying “Goddamn you.” On this outburst, the troopers thought Nigreville must be intoxicated, so they gave him a field sobriety test, but found he was not intoxicated.
After Tpr. Harper finally obtained Nigre-ville’s driver’s license, he and Wagner were *602 sitting in their police car calling on the radio to check on Nigreville’s license. It started to rain at that point and Wagner suggested they put plaintiff in the back of the police car to get him out of the rain. Harper, who was senior to Wagner, did not want to put plaintiff in the back seat of the police car because he was afraid of a physical attack by plaintiff. They decided to instruct Nigreville to sit in his own vehicle, after first searching it for weapons. Tpr. Wagner got out of the police car and was asking Nigreville to go sit in his own vehicle when Nigreville suddenly turned, moved toward Harper, pointed his finger at him in a threatening manner and yelled “You will pay for this.” At this point, Tpr. Harper, assisted by Wagner, placed plaintiff under arrest for interfering with the investigation of the accident.
Since we are reversing the trial judge on a question of fact, we will quote at some length from the three state troopers, one deputy sheriff and Miss Cason, who gave testimony in conflict with that of plaintiff. Lt. Stephens testified as follows:
“A Well, uh, after Troopers Harper and Wagner arrived and I explained things as I, as I understood ‘em, they went over to interview him. I, I assume that’s why they went over there. And I was back out — ‘cause traffic was beginning to get a little, a little heavier, as I recall. And, you know, the road was still blocked. So I went back out in the same location I had been in to see that traffic was flowing, you know, smoothly. Within a, I don’t know, a few minutes, I don’t know — have any idea how long — my attention was directed to where they were, and there was a, seemed to be a rather loud or heated discussion of some sort going on. So I went over there to see what the problem was. And, uh, I’d say Mr. Nigreville was in a very excitable state. He was shouting very loudly, some profanity. He even said that some trooper directed him to pull out into the path of this other vehicle. And so I said, I, I said I’m the one who was — who was directing traffic. I said, I believe you’re mistaken, but we’re not going to, you know, argue about that right now. I said, these troopers are investigating the accident, let’s, let’s get that taken care of and, you know, we’ll take care of the other problem. He, you know, at one — he would, uh, you know, calm down briefly, then he would, uh, he’d, you know become very agitated again. And, and this happened two or three times while I was there the first time. I kept telling him to please calm down, we had to — we had to investigate the accident, the trooper needed to ask him certain information. After two or three minutes of this, I, I don’t recall how long, he — I don’t know what he was trying to do, but he ran into me, pushed into me. I don’t know if he was trying to push me out of the way or what. I grabbed him by the arm, more or less pinned him up against the car, told him to either calm down or I would place him under arrest. At that point he did. He, he settled down. I told him to talk to these officers and answer their questions. I thought everything was under control. Then I walked back out to the intersection. Within a minute I looked back and Trooper Harper and Wagner were putting the handcuffs on him. So I went over there to see what, you know.”
Tpr. Wagner testified as follows:
“Q Exactly what did he do to interfer with you — or—or Trooper Harper?
A He was in (Interrupted)
Q Other than to say, “You’re going to pay for this.”
A He made it almost impossible for us to maintain the — Mr. Nigreville’s safety and well-being. And we got a little worried about possibly our safety, too, ‘cause we weren’t quite sure about the way he was acting. He, he would, uh, his actions were real erratic. Okay, he seemed real hostile and he’d cool down. He seemed real hostile again. And *603 then when he moved on Trooper Harper, that was the last straw. We had tried three times to calm him down, okay.
Q You say he walked toward Trooper Harper?
A I say he moved toward Trooper Harper.”
Tpr. Harper testified:
“A At that moment. Every — everything had — we had gotten Mr. Nigreville calmed down. He was — at that point prior to his whirling on me he was not doing anything, just standing there.
Q Okay. And you were in the ear doing what?
A I was talking on the microphone to the Troop.
Q Okay. And — you said he stepped toward you and he said this in what type of voice — that you were going to pay for this?
A It was a loud, belligerent voice as though he was, he was angry and, uh, he had decided and he had come to the conclusion that there was one way to settle that and that was to get to me.
Q Okay. And what did you do at that point?
A Okay. I put the mike down. I stepped out of my car. I asked him what he said. He was still coming toward me, and he told me, he said, “You’re going to pay for this.” All right. Due to the fact that he was coming toward me; due to the fact that so far I had been unable to get information on the vehicle; at that point in time I was unable to investigate the accident with Mr. Nigreville advancing on me. I walked up and placed him under arrest — told him he was under arrest.”
Deputy Sheriff Baden testified as follows:
“Q And after the, the Nigreville accident Mr. Nigreville became very belligerent; isn’t that correct?
A That’s correct, sir.
Q He became difficult to deal with for the troopers?
A Yes, sir. Yeah, he was.
Q Okay. Did it become difficult for the troopers to continue with their investigation of the second accident because of Mr. Nigreville?
A Yes, sir, it was.
Q Did you see any state trooper direct Mr. Nigreville into the lane of traffic?
A No, sir, I did not.
Q If it had been a state trooper directing him out you were in a position to have seen it; is that correct?
A That’s correct, sir.
Q And it’s your testimony that you heard Mr. Nigreville shouting or cursing or making some type of disturbance; is that correct, after the accident?
A Shouting, yes, sir.”
Miss Cason testified:
‘Q After he talked to you, the policemen came over and then what occurred?
A Then they left and went to the front of my car, and then I just saw, you know, I know that he was upset and cursing, and I remember one of the cops asked him to just settle down for a minute, you know, and they tried to talk to him.
Q And did they try and talk to him?
A Yes, they did.
Q And how did Mr. Nigreville respond?
A I just heard cursing.
Q And what occurred next?
A Uh — I remember him being handcuffed and put into the car.
Q Do you remember his manner of voice as, as he was talking to the officers?
A He was screaming at 'em.
Q Do you remember if he — anything else he said beside cursing at 'em?
A I cannot tell what words—
Q Do you remember if he made any movements toward ‘em?
A I felt like he made movement toward the policemen one time. I thought that he was fixing to jump on one of *604 the policemen, and, and that’s why I thought he was handcuffed.
Q And after he did this, he was handcuffed?
A Yes.
Q Could you hear the policemen as they were talking with Mr. Nigreville?
A The only thing I can remember hearing was when one of the policemen asked him to just settle down and talk to him. And then, all I heard was him screaming.
******
Q How did you feel — how did you feel once the officers restrained Mr. Nigre-ville? Did it make you feel any different?
A I was relieved.
Q Why were you relieved?
A Well, it wasn’t that I was really scared that he was going to do anything to me, I guess, it was just — I was just afraid because of all of the hollering and the shouting. And after the hollering and the shouting quit, well I calmed down.
Q Did it appear to you that the officers were, were hurting Mr. Nigreville as they handcuffed him and put him in the car?
A No, sir, it didn’t.
Q Did one of the troopers eventually talk to you and ask you what happened?
A Yes.
Q Were they able to carry on the investigation while Mr. Nigreville was yelling at them?
A No, sir.”
Troopers Harper and Wagner testified that after the accident plaintiff telephoned his sister, Mrs. Britt, who arrived at the scene after the officers had placed Nigre-ville under arrest. These officers testified Mrs. Britt tried to get them to release the plaintiff, stating that while in the Navy he received a head injury in a motorcycle accident, had a plate in his head and was under medication for frequent outbursts of temper and loss of touch with reality. Mrs. Britt denied making these statements to the officers, but she admitted, after being ordered by the judge to answer the question, that plaintiff did have a head injury while in the Navy.
The trial judge gave no findings of fact. He merely concluded the officers falsely arrested plaintiff. Under the testimony described above, we conclude the trial judge was clearly wrong if he accepted plaintiff’s version of the facts preceding his arrest instead of the version given by the officers and Miss Cason. After carefully reviewing the entire record, we conclude the facts are substantially those testified to by defendant’s witnesses.
LSA-Code of Criminal Procedure Article 213 provides in pertinent part:
“Art. 213. Arrest by officer without warrant; when lawful A peace officer may, without a warrant, arrest a person when:
(1) The person to be arrested has committed an offense in his presence, and if the arrest is for a misdemeanor it must be made immediately or on close pursuit;”
The misdemeanor of interference with state police in the discharge of their duties is set forth in LSA-R.S. 40:1390 as follows:
“§ 1390. Resisting arrest and interference with officers; penalty
Any person who resists arrest by any officer or agent of the division or who interferes with or obstructs the head of the division or any officer or agent thereof in the lawful performance of any duty imposed on him by this Sub-part or any duty assigned to him under authority of this Sub-part shall be fined not less than twenty-five dollars nor more than one hundred dollars or imprisoned for not less than thirty days nor more than six months, or both.”
Jurisprudence construing Article 213 holds that in a suit for damages for false arrest for a misdemeanor the officer cannot be found liable so long as he has probable cause to believe the misdemeanor has been committed in his presence. Meyers v. Ed *605 wards, 256 So.2d 337 (La.App. 1st Cir. 1971); Wells v. Gaspard, 129 So.2d 245 (La.App. 3rd Cir. 1961).
Under the version of the facts given by defendant’s witnesses and found by us to be correct, Tpr. Harper clearly had probable cause to believe that plaintiff had committed in his presence the misdemeanor of interfering with an officer.
For the reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of the defendant dismissing plaintiff’s suit at his cost. All costs in the trial and appellate courts are assessed against the plaintiff-ap-pellee.
REVERSED AND RENDERED.